OPINION OF THE COURT
Sheldon S. Levy, J.
Can information obtained directly from a defendant — without Miranda warnings and in the absence of counsel — for use on arraignment in determining eligibility for recognizance or bail release, be employed against the defendant at trial?
In the past three years, a handful of Judges, including this court, have dictated decisions on this subject off the Bench and offhand. The more than 200 employees of the New York City Criminal Justice Agency (hereinafter CJA), whose diligent interviewers gather and process such necessary information, deserve something better!
The defendant, Richard Brown, was indicted, inter alia, for robbery in the first and second degrees. The basic *367 charge was that, at knife point, he and a companion forcibly stole a sum of money from a young man who, at that time, was a messenger for the New York Daily News.
In the course of the People’s primary proof, which included positive identifications by the victim and by a police officer who joined in a subsequent chase, the prosecutor — as an added demonstration of guilt — also attempted to show a “chain of custody” and to equate a stylized, beige jacket, which the defendant was seen wearing in jail, with a similar jacket allegedly worn by one of the perpetrators during the robbery. In accordance with this objective, the trial assistant proposed to elicit, through the subpoenaed testimony of a CJA interviewer, the defendant’s asserted residence at the time of the incident (which was different from the address given to the arresting officer) and defendant’s claim that his common-law wife (who admittedly was last seen with him just after the robbery) was then living with him at the said residence.
This type of biographical data had, of course, been secured from the defendant by a CJA employee as a part of the standard prearraignment interview procedures. Accordingly, as defendant voiced legal and evidentiary objections to this offer of proof, CJA counsel appeared and moved to quash the subpoena already served as a threat to the entire CJA program. The present decision is the result of this joint opposition.
Preliminarily, it should be noted that CJA is a New York State private, not-for-profit corporation organized in 1977 and independent of formal regulation by or in connection with any government entity. Its certificate of incorporation defines its only purposes as the improvement of the administration of justice and the servicing of those who operate and are affected by the criminal justice system. It is a derivative of the Vera Foundation’s pilot project in 1961 for the encouragement of recognizance release for indigent defendants. It now serves all detainees, whether indigent or not. CJA’s primary responsibilities include: the prearraignment interviewing of almost all criminal defendants in New York City concerning their backgrounds, employment, financial resources and family and community ties; the preparation for the arraignment court of reports with *368 recommendations on a defendant’s potential for release on his own recognizance (accordingly referred to as ROR sheets); and the notification to those so released of upcoming court dates.
The work of CJA in this regard is absolutely essential to a fair and evenhanded dispensing of justice. Competent studies have fully documented the many disadvantages endured by incarcerated defendants — both pretrial and postconviction — as compared to their bailed or paroled counterparts (see 1961-1971 Report, Vera Institute of Justice, Programs in Criminal Justice Reform, part 2). Lack of adequate ability to prepare a defense, to consult with counsel, to communicate with relatives and friends, to locate witnesses and to gather evidence, are but a few, pretrial; as well as a greater likelihood of conviction in all events. Postconviction, the detainee can expect a more severe sentence.
Moreover, CJA performs an invaluable service in affording complete, and, where possible, verified pertinent information to those involved in the hearing concerning the constitutionally mandated right of a defendant to be free from excessive bail (US Const, 8th Arndt; NY Const, art I, § 5) and the decision whether, pending trial, an order of recognizance is justified (CPL 510.30). The data thus collected and contained in CJA’s ROR sheets cover, at least, three of the specified criteria to be employed by the court in such discretionary release determination upon arraignment (see CPL 510.30, subd 2, par [a], els [ii], [iii], [vi]).
In point of fact, the ROR sheet is used extensively by defense counsel in checking with defendant the facts bearing upon the prospective oral application for pretrial recognizance or bail and as a handy guide in expounding thereon before the court.
To the Assistant District Attorney in the Arraignment Part, the ROR sheet is an almost indispensable tool from which he can buttress a decision to consent to release, if the confirmed ROR data demonstrate firm community roots, or to attack such an application and recommend substantial bail, if the ROR report proves unfavorable to the defendant.
*369 It is also this same ROR sheet that is continually employed by the court for rapid reference and ready guidance in relation to a defendant’s community roots, current family residence, and employment status, so that a sensible, fair and informed decision can be made with respect to the conditions of any securing order or of a defendant’s possible liberty while awaiting trial.
Like reconnaissance troops in an army, they also serve — and serve well — who gather vital information for use on the legal battlefronts in the war for justice. CJA’s usefulness can neither be overemphasized nor its employees too highly praised.
Moreover, the linchpin of the program has always been to secure the full and honest co-operation of the interviewees and to provide thereby complete and candid information to the court. However, when CJA representatives arrive, these defendants are already in custody and in a condition of emotional upheaval, of maximum stress and of unusual excitement. They are newly arrested and are often placed in a cramped jail cell with an abundance of other prisoners. Usually, their sole thought is to secure a rapid release from detention, whether on recognizance or reasonable bail. Frequently, they have neither seen nor spoken to friends, relatives or even a lawyer. They are rightly wary of speaking to strangers at all — and especially to one who is inquiring about intimate details of their lives. No Miranda warnings are provided. No defense attorney is present. Defendants are affirmatively informed that the information requested will be considered by the Judge in connection with their recognizance or bail applications, that their co-operation is essential to a favorable recommendation, and that their statements can be used against them if they violate any release conditions.
Obviously, a defendant should be permitted voluntarily to give biographical data to a CJA staff member — with as free a mind as possible under the attendant circumstances — in an attempt to put his arguments for recognizance release or attainable bail in the best possible light. However, if a defendant is also advised that any statements made — even if true and innocuous at the time — might later be used affirmatively at trial to help prove guilt, *370 many defendants will refuse to converse with CJA personnel at all and others will limit their responses in a fashion that will seriously impede their chances for immediate freedom. The detrimental effect of such a reaction on the defendants themselves and on the entire CJA program is clear, and the heretofore innumerable successes of the ROR plan will be consequently and substantially reduced.
In addition, any threat to or infringement upon the continued vitality and viability of this and similar programs throughout the State would be antithetical to the public policy of this State and to the proper functioning of the courts (cf. State v Winston, 300 Min 314, 318-319). Through the years, as indicated, CJA and its predecessors have developed an efficient and effective operational plan which has benefited immeasurably both Bench and Bar and which has achieved outstanding results, particularly in obtaining fair and expeditious release conditions for deserving detainees; in enhancing the equitable treatment of indigent defendants; and in lessening materially thereby the prospective burden of overcrowding in places of confinement. If the CJA system is jeopardized, the defendants, the courts, and the public will most certainly be the prime losers. Neither law, nor logic, nor practicality would be served by permitting prosecutorial prerogative to override common sense and simple justice in this regard. Plainly put, acknowledging the multiple merits and obvious advantages of the CJA program, why should any step be taken to eviscerate or destroy it? Why revert our criminal justice system to one of criminal injustice?
Strictly then, as a matter of public policy and fundamental fairness, and especially since all of the circumstances under which this ROR information is obtained militate against its uninhibited use by the prosecution, all statements secured from a defendant during this prearraignment interrogation process should be barred from purely affirmative use by the People on both their direct and rebuttal cases (see People v Rodriquez, 48 AD2d 691, affd 39 NY2d 976). This is especially true since a fair amount of the same information which might be sought to be elicited from the ROR sheets, if admissible at all, would usually be available to the prosecution from other sources, such as *371 arrest sheets and independent investigations. However, as to the utilization of ROR data on cross-examination of the defendant for credibility testing purposes only, this issue — which will be discussed later — appears already to have been resolved in this State against the defendant.
Nevertheless, there is also no dearth of possible legal and equitable grounds on which a similar determination, barring the affirmative use of ROR material by the People, could be premised. Admittedly, some of the prospective arguments are more appealing than others, but when these assertions are considered as a whole, their persuasive quality should be conclusive.
Initially, it should be noted that the data, presently obtained from co-operative defendants by CJA interviewers, goes far beyond the mere pedigree information secured by arresting officers during the “booking” procedures (compare Interview Report, New York City Criminal Justice Agency, with Arrest Report, Police Department, City of New York). For example, the police official asks simply for the defendant’s residence. The CJA staff member, on the other hand, inquires also as to: the length of such residence; with whom the defendant lives; any alternative residence; and the names of friends and relatives who can confirm such information. Accordingly, the dicta and equivocal holding of the Court of Appeals in People v Rodriquez (30 NY2d 976, 978, supra) that the defendant “was not entitled to preinterrogation warnings before being asked pedigree information in an interview in connection with his possible release on his own recognizance” should not be controlling in any manner today where much more than pedigree is requested and revealed.
In the view of this court, if Judges seriously contemplate permitting the prosecutor to use ROR statements against a defendant as part of the People’s affirmative case, then the lack of adequate preliminary warnings thereof would constitute a violation of a defendant’s constitutional rights (see Miranda v Arizona, 384 US 436, and its progeny). Nor can CJA representatives then be classified as mere inquisitive civilians who would not be required to give Miranda admonitions (Burdeau v McDowell, 256 US 465; People v Horman, 22 NY2d 378). Instead, if the information ob *372 tained could ultimately be used affirmatively by both the District Attorney and the court (and could also even be employed by the police), the CJA interviewers — at least for these purposes — would have to be held to be trained and experienced “agents” of the police, the prosecutor and the criminal justice system (see CPL 60.45, subd 2, par [b]; People v Jones, 47 NY2d 528).
Furthermore, the want of warnings, and the nonvoluntary nature of the data derived, is exacerbated by the lack of the presence of an attorney during the CJA interrogation, especially in light of the compelling conditions under which the interview is conducted and the particular questions asked (see People v Samuels, 49 NY2d 218; People v Settles, 46 NY2d 154; People v Arthur, 22 NY2d 325; People v Friedlander, 16 NY2d 248; People v Gunner, 15 NY2d 226; People v Donovan, 13 NY2d 148). It begs the issue to suggest that the right to counsel obtains only at a “critical stage” of the prosecution (see Coleman v Alabama, 399 US 1, 7), and that this is not. If the People are automatically able to use information provided by the defendant as a part of their proof of guilt, then this prearraignment interview can easily and often become a very “critical stage” of the prosecution’s case. Even though the original purpose for securing the information may not be so related to the offense as to require Miranda warnings (see United States ex rel. Hines v La Vallee, 521 F2d 1109, 1112-1113, cert den 423 US 1090), that purpose changes when the People are allowed to use the CJA product for affirmative prosecution. Moreover, as the statistics have shown, whether a defendant is released preliminarily can itself frequently determine whether the defendant will be convicted as charged and, if so convicted, the severity of the sentence.
In addition, serious concern must be voiced that a defendant, by verbally attempting to exercise the constitutional right to be free from excessive bail (US Const, 8th Arndt; NY Const, art I, §5), may be forced to relinquish the constitutional right to remain silent (US Const, 5th Arndt; NY Const, art I, § 6), especially if the People’s view should prevail. Nor should any of a defendant’s constitutional rights be eradicated by the simple, self-serving assertion that: “It’s all for the defendant’s benefit, anyhow.”
*373 Finally, there are a number of other contentions that can be argued in support of the same position that would bar at trial the People’s direct use of ROR data. CJA’s initial declaration to all clients — that it seeks information to aid a defendant to secure pretrial release — can readily be interpreted as creating an implied agreement that such information be employed only for such purposes (see State v Winston, 300 Minn 314, 318-319, supra). Of course, if a defendant violates the conditions of any securing order, all information, as defendant is also informed, can then be made available to police authorities to aid in apprehension efforts. Furthermore, since an aura of at least implied confidentiality pervades the entire question-and-answer session between defendant and interviewer, the elicited responses could easily constitute action by the defendant in reliance upon the interviewer’s original explanation of purpose (see Killough v United States, 336 F2d 929). Lastly, there also appears a practical, if not a legal, invasion of a defendant’s right of privacy in the virtually compelled revealment — for verification purposes — of the names of relatives and friends, which might ultimately cause damage to a defendant’s reputation, create domestic difficulties, jeopardize present and future employment, and even be used to harass or prompt surveillance of the defendant and of those named.
Even if universal agreement on all points aforesaid is not reached, there is no doubt that the combined force of these conclusions buttresses materially the present determination.
Nevertheless, none of the foregoing should be read to infer that this court agrees with the further reasoning of CJA counsel that the information provided by defendants should not be permitted to be used for any purpose at all. It cannot be supported, realistically or legally, that, if a defendant gives information to the CJA representative and testifies differently at trial on a relevant issue, the People should not be allowed to employ such asserted inconsistency in an endeavor to impeach a defendant’s credibility on the stand.
It is one thing to hold that a defendant’s prearraignment statements to the CJA interviewer cannot be used initially *374 by the People on the issue of guilt. It is quite another to have the defendant testify personally at trial in a fashion which is materially inconsistent with or contradictory to such ROR statements and expect to bar the People from attempted impeachment on the issue of credibility.
In a readily adaptable practice, ROR data should be treated in the same manner as a defendant’s statements previously suppressed for want of Miranda warnings, and should be able to be used only for cross-examination on the question of credibility (People v Rodriquez, 39 NY2d 976, supra; People v Harris, 25 NY2d 175, 177, affd 401 US 222). However, to avoid prosecutorial excesses, even before suppressed evidence can be employed to impeach a defendant’s credibility, the defendant must affirmatively open the door in direct testimony by stating facts or by offering a version of the facts contradictory to the suppressed or previously inadmissible evidence (People v Wise, 46 NY2d 321; People v Rahming, 26 NY2d 411; People v Miles, 23 NY2d 527, cert den 395 US 948; People v Robbins, 78 AD2d 750). Nevertheless, a defendant’s statements made in response to proper cross-examination reasonably suggested by defendant’s direct examination are also subject to otherwise proper impeachment by evidence that is inadmissible on the People’s direct case (see United States v Havens, 446 US 620).
Moreover, as a matter of CJA policy, all defendants are warned at the outset by CJA personnel that efforts will be made to verify all information and that false information will not only not be helpful, but will undoubtedly be a serious detriment.
A defendant should be shielded from the prospective employment of his ROR answers in an attempt to prove guilt, since otherwise, such potential use will have a chilling and deterring effect on his desire or ability to cooperate fully in the prearraignment process and to provide complete, candid and verifiable information. A defendant should not be permitted, however, to use these beneficial procedures as a sword to strike down legitimate credibility testing on the part of the prosecutor (People v Tramontano, 65 AD2d 762).
*375 Accordingly, since the basic purpose of a bail hearing is to insure a defendant’s appearance (CPL 510.30, subd 2, par [a]; Reynolds v United States, 80 S Ct 30, 32; People ex rel. Lobell v McDonnell, 296 NY 109), and since all concerned are seeking to avoid unnecessary deprivations of liberty, the courts should declare finally, firmly, forcefully and consistently that it is the public policy of this State to encourage the work of the CJA in the ROR procedures; to urge defendants to provide full and honest information to CJA interviewers for ultimate use by the court and counsel; and to assure defendants that their answers will not be admissible against them in court on the issue of guilt and that only false or inconsistent statements may be employed by the People at trial as a test of their personal credibility.
In the opinion of this court, the public policy of this State and the fair administration of justice demand no less, and this court, for one, so declares. It would not be untoward, however, if the Legislature also so declared, and formalized these protective procedures.
For the reasons stated, at this posture of the case, the objection to the People’s offer of proof is sustained, and the subpoena directed to the appearance of the CJA employee is quashed as unnecessary, improper and premature. Leave is granted to the People, however, to serve CJA with a new subpoena, if and when warranted hereafter by virtue of the defendant’s own testimony at trial.