■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TODD WILLIAMS, Appellant. [695 NYS2d 544] —Judgment, Supreme Court, Bronx County, (Irene Duffy, J., at suppression hearing; Eugene Oliver, J., at trial), rendered November 15, 1995, convicting defendant, after a jury trial, of attempted robbery in the first degree, reckless endangerment in the first degree, attempted robbery in the second degree and criminal possession of a weapon in the second degree, and sentencing him, as a second felony offender, to concurrent indeterminate terms of five to ten years imprisonment on the first conviction, two to four years imprisonment on each of the next two convictions and three to six years imprisonment on the weapons conviction, unanimously affirmed.

The evidence at trial established that at about 3:00 A.M. on April 10, 1993, defendant, after a confrontation with a total stranger, named Richard Campbell, taunted, struck and pursued Campbell for several minutes on a Bronx bound No. 2 train. Defendant displayed the magazine of a gun to his victim and later hit him with it. When Campbell stumbled into the next car to evade him, the defendant pursued him, waving a black, semi-automatic machine pistol that looked like a Tech 9 or an Uzi. Defendant pointed the pistol at everyone in the subway car, menacing them and stating to Campbell, give me your radio or I'll shoot your "flock" (friends). When the train pulled into the 174th Street station, defendant got off, firing two shots back into the window of one of the subway car doors.

Later that morning, defendant was identified from a photo array by two eyewitnesses, one of whom, Amos Durham, knew him from the Bronx Edenwald projects. Defendant's first trial ended in a hung jury.

At his second trial, which resulted in defendant's conviction, Mr. Durham, who had not testified at the first trial, testified that he was riding in the ninth car of the same train. He saw defendant, whom he knew by name, and called out to him. They then had a brief conversation, after which Durham observed the victim Campbell board the train at the Third Avenue station, the ensuing confrontation, and defendant's attack on Campbell. He then saw defendant, who was waving a black semi-automatic "machine pistol", pursue Campbell into the tenth car. To get out of harm's way, Durham headed in the opposite direction to the eighth car. Although Durham did not see the defendant actually fire the shots, he heard the shots and saw defendant run away.

Campbell, Durham and a third independent witness, Wanette Douglas (who was sitting in the tenth car) all provided the Transit Police with descriptions of defendant. Significantly, Durham identified defendant by his first name, "Todd", when speaking to the Transit Police at the scene of the crime on the morning of the incident.

Thereafter, in the early morning of April 15, 1993, based upon a tip, 15 to 20 Transit and Yonkers police officers went to the Yonkers apartment of defendant's girlfriend Candice James, the mother of his young daughter, where, after a lengthy confrontation through the closed door, Ms. James, fearing for the safety of her baby, opened the door and defendant was arrested. A subsequent search, conducted with Ms. James's written consent, uncovered a nine-millimeter semi-automatic pistol hidden in the back of a television set, a fully loaded 30-

round magazine and other loose ammunition. Later that morning, defendant was identified by the victim and one of the eyewitnesses at a station-house lineup.

The gun and ammunition recovered from the apartment were subsequently suppressed upon a finding that consent to enter and search was not voluntarily given and that defendant's arrest was illegal under *Payton v New York* (445 US 573) in that his arrest in his home without a warrant was not otherwise justified. The suppression court, however, found both the photo array and lineup identifications of defendant admissible.

As noted above, defendant's first trial ended in a hung jury. At his second trial, defendant presented an alibi defense based upon the testimony of his girlfriend, Ms. James, who stated that, at the time of the April 10, 1993 subway shoot-out, she and defendant, who had been living with her and their daughter since the previous October, were asleep in the Yonkers apartment after watching television.

Defendant now objects that the District Attorney's cross-examination of Ms. James by means of her prior statement, made in her written consent given to police shortly after defendant's arrest, was improper because the suppression court had ruled that such statement was "coerced". Such consent included the following statement: "I Candice James rent Apartment 3-B of Glenwood Gardens. Todd visits his daughter but does not live at my house."

However, there was no finding by the suppression court that the statement was coerced. In suppressing the gun and ammunition, the court merely found that "the People [had] not sustained their burden of proof as to the voluntariness or legal sufficiency of the consent to enter, search and seize in this matter". Nowhere did the court find the statement or consent to be "coerced". Furthermore, appellant's reliance upon *People v Hults* (76 NY2d 190) is misplaced since that case involved the cross-examination of a complainant with her prior hypnotically induced statements (i.e., the product of suggestion or "confabulation").

The hearing court was not addressing whether Ms. James's written statement could be later used at trial. The sole issue addressed and decided was, in its words, whether the People had met their "heavy burden of proving the legal sufficiency of the purported consent." Thus, absent any finding that Ms. James's prior statement was "actually coerced" or "unreliable" (*cf., People v Hults, supra,* at 198), it was proper for the District Attorney, on cross-examination, to ask her if it was not a fact that she told the police that defendant did not live with her and he only visited with his daughter.

The trial court, which reviewed the suppression court's decision, also correctly determined that Ms. James's consent, written ·in her own hand, could be used to cross-examine her. A witness's pretrial statements are not afforded the same constitutional status as those of a defendant. On the contrary, since Ms. James placed the defendant at a location other than the scene of the crime, it is axiomatic that alibi, although not technically a "defense", is treated as one and must be disproved beyond a reasonable doubt (*People v Victor*, 62 NY2d 374; *see also, People v Warren*, 76 NY2d 773; *People v Campbell*, 70 NY2d 724; *People v Holt*, 67 NY2d 819; *People v Whalen*, 59 NY2d 273). Thus, the prosecution, to meet its burden of disproving defendant's alibi evidence beyond a reasonable doubt, needed to have a fair cross-examination of Ms. James. Even defendant himself would not be immune from forceful cross-examination. (*People v Overlee*, 236 AD2d 133, 136, *lv denied* 91 NY2d 976 ["prosecutor need not tread lightly in cross-examining (defendant)"]).

Moreover, the issue is unpreserved for review because the defense objection to the District Attorney's line of questioning came only after the District Attorney had finished her questioning on this point and stated: "I have no other questions with respect to that", and because the defense argued at trial only that the witness's statement on the consent form was involuntary, not, as now, that it was also unreliable.

Likewise, defendant's claim that the District Attorney's cross-examination of his alibi witness with portions of defendant's Grand Jury testimony and his statement in his Criminal Justice Agency (CJA) interview is unpreserved and without merit. Ms. James's trial testimony was that defendant lived with her for six or seven months. Defense counsel made only a non-specific objection to the District Attorney's question of whether her testimony would change if she learned that he had told the CJA interviewer that he had been living with her only one month. Similarly, defendant offered only an "objection" when the District Attorney cross-examined the witness about her trial testimony that defendant worked construction security·in Manhattan, utilizing the defendant's statement to CJA that he worked construction in the Bronx. It was only the next day, after both sides had rested and summations were about to begin, when defense counsel sought to make his record that it was improper for the District Attorney to impeach his alibi witness with defendant's prior statements. Clearly, such argument was untimely.

In any event, the District Attorney could have offered

defendant's CJA interview on direct or rebuttal since it was defendant's pedigree evidence. Furthermore, defendant's Grand Jury testimony could have been offered on direct or rebuttal since it is a statement by defendant. Thus, it was only the form of the questions to the witness that may have been objectionable and any error in this regard was harmless.

A reading of the direct and cross-examination provides no support for the argument that the court's rulings were unfair to the defense or that the prosecutor unfairly questioned Ms. James or eviscerated his alibi defense. Indeed, it reflects the contrary.

As to defendant's *Rosario* claim regarding the People's failure to provide him with a transcript or tape recording of a radio transmission made by Transit Detective Eugene Ramos, one of the officers responding to the scene, the trial court, after hearing testimony from both responding officers and inquiring of the District Attorney as to the existence of such a transcript or tape, correctly concluded, as a factual matter, that there was no competent evidence adduced to support a finding that a tape recording of Detective Ramos's radio transmission had ever been made.

The existence of a tape recording of the New York Police Department Sprint transmission is not proof of a similar Transit Police tape as argued by defense counsel.* The alternative defense position here, that the case should be remanded to determine whether a tape recording of Detective Ramos's transmission was created, is equally unavailing. Defense counsel never followed up on his request that Detective Ramos search for a tape at headquarters and never followed up on the District Attorney's offer to locate the name of the person in the Transit Police communication records department who told her that the "tapes do not exist". Defense counsel never sought a knowledgeable witness or a further subpoena and had a full opportunity to develop a factual record, but chose not to do so although clearly aware of the issue at hand. Having abandoned the issue at trial, defendant cannot now be heard to complain that the trial court erroneously refused his request for an adverse inference charge (*see, People v Sierra*, 222 AD2d 216).

We have considered defendant's *Payton* and *Batson* points and find them without merit. Concur—Williams, J. P., Tom, Lerner and Andrias, JJ.

---

* The departments were separate and distinct entities at the time of the incident.