# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 39
The People &c.,
   Appellant,
  v.
Cid C. Franklin,
   Respondent.

John M. Castellano, for appellant.
Hannah Kon, for respondent.
University at Buffalo Law School Amicus Brief Practicum, amicus curiae.

HALLIGAN, J.:

This case requires us to determine when an out-of-court statement is "testimonial" and thus triggers the requirements of the Sixth Amendment's Confrontation Clause. Consistent with precedent from the United States Supreme Court, we ask whether, in light

- 1 -

of all the circumstances viewed objectively, the statement was created for the primary purpose of serving as trial testimony. Contrary to the Appellate Division, we conclude that the CJA report at issue here does not qualify under this standard.

I.

In the course of responding to a road rage incident that included a report of a firearm, police officers searched the basement of the home that the defendant Cid Franklin shared with his son and stepmother, Grace Mapp. Officers discovered a gun in a basement closet containing blankets, pillows, and other miscellaneous items belonging to both Mapp and Franklin. Franklin was subsequently arrested and, while in Queens central booking prior to arraignment, interviewed by an employee of the Criminal Justice Agency (CJA), as is standard practice for New York City defendants.

CJA is a nonprofit organization funded by the City of New York that provides pretrial services similar to those provided by probation departments in counties outside the city (*see People v Yu*, 167 AD3d 521, 522 [1st Dept 2018]). As relevant here, CJA interviews "nearly all individuals arrested" in New York City "to make a pretrial release recommendation to the court" (New York Criminal Justice Agency, http://www.nycja.org/; *see also People v Jin Cheng Lin*, 26 NY3d 701, 715 n 1 [2016]; *People ex rel. Maxian v Brown*, 77 NY2d 422, 425 [1991]). In interviewing arrestees to determine their suitability for pretrial release, CJA employees ask them questions regarding community ties and warrant history, including an arrestee's address, how long they have lived there, their employment status, whether they expect anyone at their arraignment, their education, and other relevant queries. The CJA employee records the answers to these questions on a

standardized form titled "Interview Report."  The employee also verifies the information provided by the arrestee with a third person, whose contact information the CJA employee obtains from the arrestee, and records that verification in a separate section of the form. The CJA employee then gives the completed form, including a recommendation on whether the arrestee is suitable for release, to the arraignment judge, the prosecutor, and defense counsel.

As relevant here, the CJA employee who interviewed Franklin recorded his address as "117-48 168th St, BSMT."  The employee also recorded that he or she verified this information with Mapp, referred to as Franklin's "mother" on the form.

That form was central to the People's case at trial.  No DNA or fingerprints were discernable on the gun.  The officer who took Franklin's pedigree information testified that Franklin gave his address as 117-48 168th Street, without specifying where in the house he lived.  None of the witnesses who testified at Franklin's trial provided direct proof that he lived in the basement, and the People put forth no evidence that any personal documents or effects of Franklin's were found there.  To prove that Franklin had dominion and control over the basement, the People introduced the CJA form through the current CJA Queens borough supervisor, Oscar Morales.  The interviewer was no longer employed by CJA and did not testify.

Defense counsel objected to the introduction of the form both as hearsay[1] and as a violation of Franklin's Sixth Amendment right of confrontation. Supreme Court rejected both objections, admitting the form as either "a public document" or "a business record," and finding that "there is no *Crawford* violation in that this was not made specifically for [a] prosecution purpose," but rather "as an aid to the Judge to [determine] if any bail should be set at arraignments." Franklin was convicted of one count of second-degree criminal possession of a weapon (Penal Law § 265.03 [3]).

The Appellate Division reversed, holding that the introduction of the report through Morales, who did not author it, violated Franklin's Confrontation Clause rights (207 AD3d 476 [2d Dept 2022]). A Judge of this Court granted leave to appeal (39 NY3d 986 [2022]), and we now reverse.

II.

The Sixth Amendment of the Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against [them]" (US Const Amend VI). The Confrontation Clause focuses on " 'witnesses' against the accused—in other words, those who 'bear testimony' " (*Crawford v*

---

[1] Defendant also argues before us that the report was improperly admitted under the hearsay rules (*see e.g. Matter of Leon RR*, 48 NY2d 117, 122-123 [1979] [addressing embedded hearsay in business reports]; Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPRL C4518:3 [discussing records with "multiple layers of hearsay"]). The Appellate Division reversed the judgment based solely on its determination that the Confrontation Clause was violated, and we reach no issue in this appeal other than the grounds on which the Appellate Division ruled.

*Washington*, 541 US 36, 51 [2004]).   Thus, to determine whether the defendant's confrontation rights were implicated by introduction of the CJA report, we ask whether the report was "testimonial" (*id.*).

The Appellate Division relied on *Crawford*'s definition of testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" (207 AD3d at 476, quoting *Crawford*, 541 US at 51).   Citing several decisions that apply an "essential element" test, the court reasoned that introduction of the CJA form violated the Confrontation Clause because it was "admitted in order to establish an essential element" of the charged crime, and defendant "was never given the opportunity to cross-examine the CJA employee" who prepared it (*id.* at 477, citing *People v Ellerbee*, 203 AD3d 1068, 1069 [2d Dept 2022] [testimony "improperly admitted in order to establish an essential element of the crime" in violation of the Confrontation Clause], *People v Stokeling*, 165 AD3d 1180, 1181 [2d Dept 2018] [same], and *People v Francis*, 114 AD3d 699, 700 [2d Dept 2014] [introduction of facts going to essential element through supervisor insufficient]).

These "essential element" cases generally rest on our decision in *People v Pacer* (6 NY3d 504 [2006]).   In *Pacer*, decided two years after *Crawford*, the People relied on an affidavit explaining the Department of Motor Vehicle's routine procedures that had been prepared for use at trial to prove that the defendant knew or had reason to know his driving privileges had been revoked (*see id.* at 507).   This Court held that introduction of the affidavit violated the defendant's right of confrontation because "the lack of a live witness to confront eliminated defendant's opportunity to contest a decisive piece of evidence

against him" (*id.* at 512).  *Pacer* and several subsequent cases, including the Appellate

Division's decision below and the cases it cites, look to whether an out-of-court statement

establishes an essential element of the crime to determine whether it is testimonial.

As we recently recognized in *People v Ortega*, the Supreme Court has refined its

Confrontation Clause analysis on numerous occasions since it decided *Crawford* in 2004

(40 NY3d 463, 474 [2023][2]; *see also Ohio v Clark*, 576 US 237, 244 [2015] [noting the

Supreme Court's "labor( )" subsequent to *Crawford* to "flesh out what it means for a

statement to be 'testimonial' "]).  These decisions render some of our earlier analyses at

odds with the current framework (*see e.g. Ortega*, 40 NY3d at 474 [recognizing that our

previous analysis in *People v Freycinet* (11 NY3d 38 [2008]) was "inconsistent with the

demands of the Confrontation Clause as articulated more recently by the Supreme Court"]).

As with the test applied to autopsy reports in *Freycinet*, the "essential element" approach

in *Pacer* has been eclipsed by subsequent developments in Confrontation Clause

jurisprudence.  We now clarify that in ascertaining whether out-of-court statements are

testimonial, courts should inquire, as the U.S. Supreme Court has instructed, "whether in

light of all the circumstances, viewed objectively, the 'primary purpose' of the

conversation was to 'creat[e] an out-of-court substitute for trial testimony' " (*Clark*, 576

---

[2] *Ortega* presents the distinct question of when forensic reports are testimonial (40 NY3d at 474; *see also Melendez-Diaz v Massachusetts*, 557 US 305, 307-308 [2009] [certificates of analysis indicating that seized material was cocaine]; *Bullcoming v New Mexico*, 564 US 647, 651 [2011] [forensic laboratory report certifying defendant's blood-alcohol concentration]; *Williams v Illinois*, 567 US 50, 56 [2012] [DNA profile]).  We do not address that issue here.

US at 245, quoting *Michigan v Bryant*, 562 US 344, 358 [2011]).  When that standard is met, the statement should be deemed testimonial for purpose of the Confrontation Clause.

### III.

The Supreme Court first articulated the primary purpose test only months after this Court decided *Pacer*, in two cases concerning out-of-court statements from domestic abuse victims (*see Davis v Washington* and *Hammon v Indiana*, 547 US 813 [2006]).  In *Davis*, the statements at issue were made to a 911 operator (*id.* at 817-819), and in *Hammon*, to police officers after a physical attack (*see id.* at 820).  The Supreme Court concluded that the statements in *Davis* were not testimonial because they were made "under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency," while in *Hammon*, the statements were testimonial because "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution" (*see id.* at 822).

Since *Davis* and *Hammon*, the Supreme Court has continued to apply the primary purpose test in cases concerning out-of-court conversations (*see Bryant*, 562 US at 360 [examining the "primary purpose" of an out-of-court interrogation through an "objective analysis of the circumstances of (the) encounter and the statements and actions of the parties"]; *Clark*, 576 US at 245 [reaffirming the primary purpose test]).[3]  *Clark* confirms

---

[3] The federal circuits likewise apply the primary purpose test (*see e.g. Johnson v Griffin*, 2024 WL 302387 *3 [2d Cir 2024]; *United States v Latu*, 46 F4th 1175, 1180 [9th Cir 2022]; *United States v Stepanets*, 989 F3d 88, 116 [1st Cir 2021]; *United States v Miller*, 982 F3d 412, 434-435 [6th Cir 2020]; *United States v Mathis*, 932 F3d 242, 255 [4th Cir

the centrality of the primary purpose test and sets forth relevant considerations: whether

the statements were made under circumstances indicating "that the primary purpose of the

interrogation is to establish or prove past events potentially relevant to later criminal

prosecution" (*id.* at 244, quoting *Davis*, 547 US at 822 [internal quotation marks omitted]);

the "informality of the situation and the interrogation," with a "formal station-house

interrogation, like the questioning in *Crawford*, . . . more likely to provoke testimonial

statements, while less formal questioning is less likely to reflect a primary purpose aimed

at obtaining testimonial evidence against the accused" (*id.* at 245, quoting *Bryant*, 562 US

at 366, 377 [internal quotation marks omitted]); the "standard rules of hearsay, designed to

identify some statements as reliable" (*id.*, quoting *Bryant*, 562 US at 358-359 [internal

quotation marks omitted]); and to whom the statements are made, as "[s]tatements made

to someone who is not principally charged with uncovering and prosecuting criminal

behavior are significantly less likely to be testimonial than statements given to law

enforcement officers" (*id.* at 249).

Defendant contends that *Crawford* articulates a "core class" of testimonial

statements that are always subject to the Confrontation Clause and thus immune from

primary purpose analysis, and that the CJA report here falls within that category because

an objective witness would reasonably believe it "would be available for use at a later trial"

---

2019]; *United States v Buluc*, 930 F3d 383, 392 [5th Cir 2019]; *United States v Hano*, 922 F3d 1272, 1287 [11th Cir 2019]; *Lambert v Warden Greene SCI*, 861 F3d 459, 469-470 [3d Cir 2017]; *United States v Klemis*, 859 F3d 436, 444 [7th Cir 2017]; *United States v LeBeau*, 867 F3d 960, 980 [8th Cir 2017]; *United States v Alcorta*, 853 F3d 1123, 1137 [10th Cir 2017]).

(541 US at 52 [internal quotation marks omitted]).  *Crawford*, however, acknowledged that it was leaving "for another day any effort to spell out a comprehensive definition of 'testimonial' " (*id.* at 68), and the Supreme Court has subsequently applied the primary purpose test to statements falling within *Crawford*'s "core class" of police interrogations to determine whether they were testimonial (*see Davis*, 547 US at 822; *Bryant*, 562 US at 355).

Precedent therefore confirms that an out-of-court statement is testimonial when, viewed objectively, all the circumstances indicate its primary purpose was to create an out-of-court substitute for trial testimony.[4]

IV.

We now turn to whether the introduction of the CJA Interview Report violated the Confrontation Clause.  The CJA report is markedly different from the mine-run of evidence that runs afoul of the Confrontation Clause in several key respects.

First, though we do not resolve the defendant's hearsay objection here (*see* n 1, *supra*), we note that the CJA report was introduced as a business or public record.  As the Supreme Court has explained, "[b]usiness and public records are generally admissible

---

[4] The dissent appears to agree that the primary purpose test governs this inquiry (dissenting op at 7-8), notwithstanding comments that the test "was written" only for "the kinds of statements. . . in *Clark* and *Davis*" (dissenting op at 10), and suggesting that a nebulous "but for" standard informs the primary purpose test (dissenting op at 11).  These points are either unsupported by or contradicted by precedent.  To the extent the dissent suggests that courts may "pick and choose" among standards (dissenting op at 12 n 5), we are bound to follow the Supreme Court's precedent on the Sixth Amendment.

absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial" (*Melendez-Diaz*, 557 US at 324; *see also Crawford*, 541 US at 56 ["Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records"]).

Second, the People introduced the report not to put before the jury the CJA interviewer's conclusions, but as evidence that Franklin had "self-report[ed]" his residence as the basement of the house. According to the CJA supervisor's testimony, standard practice is that all the information of the report, including the defendant's address, comes "from the defendant," though it is also later "verified" through a third party. But the People's argument that because the defendant, rather than the CJA employee, was the declarant, the statement falls outside the ambit of the Confrontation Clause is unpreserved for our review. We therefore proceed to the merits of the Confrontation Clause assuming, arguendo, that the CJA interviewer was the declarant of the statements found on the form for purposes of the Confrontation Clause.

Under the relevant circumstances, we conclude that the primary purpose of the CJA interview report was not to create an out-of-court substitute for trial testimony, and that it is not therefore testimonial. The primary purpose of a CJA interview and resulting report is administrative, not something tailored "to establish or prove past events potentially relevant to later criminal prosecution" (*Clark*, 576 US at 244 [internal quotation marks omitted]). Its objective is to give the arraignment judge information pertaining to a

defendant's suitability for pretrial release (*see Yu*, 167 AD3d at 522), not to elicit incriminating statements. This function is reflected in the pedigree nature of the questions posed to defendants during these interviews (*see e.g. People v Williams*, 264 AD2d 325, 328-329 [1st Dept 1999] [defendant's "CJA interview" is "defendant's pedigree evidence"]), and confirmed by the notation on the face of the report: a CJA report "assesses the defendant's risk of flight by considering . . . community ties and warrant history as defined in sections 2(a)(ii) and 2(a)(iii) and (vi) of CPL 510.30 and open cases," and "does not consider other criteria listed in CPL 510.30 such as defendant's mental condition, the weight of the evidence, or the possible sentence."

We find it significant that a CJA interview report is routinely prepared for all arrestees in New York City. The information collected is the same in every case, regardless of the particular facts or the elements of the relevant crime: the interviewer collects a predetermined set of pedigree information from the defendant and makes a recommendation to the court as to the defendant's suitability for pretrial release.[5] As for the verification step (*see* dissenting op at 9), the record indicates that the defendant provides the verification source and contact information, and there is no indication that the CJA employees conduct any independent inquiries.

The dissent opines, without any record support, that CJA interviewers are "standing in the shoes of a law enforcement officer" (dissenting op at 13). To the extent this

---

[5] The information the defendant provides to the CJA may assist him by facilitating his release (*see* New York Criminal Justice Agency, https://www.nycja.org [CJA description of its mission as "assist(ing) the courts and the City in reducing unnecessary pretrial detention"]).

characterization sweeps in practices "everywhere else in the state" (*id.* at 6), our decision rests on the facts before us in this case, not suppositions about other approaches to providing pretrial services. As explained, while CJA employees work within the court system, they are not "principally charged with uncovering and prosecuting criminal behavior" (*Clark*, 576 US at 249), and for this reason are not law enforcement officers as contemplated by the Supreme Court's Confrontation Clause jurisprudence.[6]

That a CJA report is generated for a court and has consequences for a defendant's liberty does not change the fact that its primary purpose is administrative, and not testimonial.[7] We note that other courts have reached a similar conclusion regarding other records primarily prepared for administrative reasons (*see Melendez-Diaz*, 557 US at 324 [records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial" are "not testimonial"]; *see also United States v Noria*, 945 F3d 847, 856, 859 [5th Cir 2019] [forms created by Customs and Border Patrol

---

[6] Even if we viewed the CJA employee as akin to a probation officer, that alone would not make the report testimonial since we have long recognized that even police officers conduct both "investigative inquiries" and inquiries purely directed at "administrative concerns" (*see e.g. People v Wortham*, 37 NY3d 407, 415 [2021], citing *People v Rodney*, 85 NY2d 289, 294 [1995] [addressing the pedigree exception to *Miranda*]).

[7] Use of the report to determine whether a defendant should be released prior to trial does not make the report testimonial, contrary to the dissent's contention (*see e.g.* dissenting op at 10). " '[T]he right to confrontation is a *trial* right,' available against witnesses *at trial*" (*People v Hameed*, 88 NY2d 232, 239 [1996], quoting *Pennsylvania v Ritchie*, 480 US 39, 52-53 [1987], and citing *Barber v Page*, 390 US 719, 725 [1968] [right to confrontation is "basically a trial right," contrasting trial with preliminary hearings, which are "much less searching" inquiries into whether "to hold the accused for trial"]). The only case the dissent offers in support of its view is a trial court opinion that does not discuss the Confrontation Clause and has been cited only once in 40 years (*see* dissenting op at 10-13, citing *People v Brown*, 109 Misc 2d 366 [Sup Ct, New York County 1981]).

relaying migrants' basic information not testimonial because routinely created in the course of the agency's "non-adversarial duties," not "in anticipation of litigation"]; *United States v Caraballo*, 595 F3d 1214, 1228-1229 [11th Cir 2010] ["basic biographical information" that is "routinely requested" not testimonial, though it may later become relevant to prosecution]; *United States v Torralba-Mendia*, 784 F3d 652, 666 [2015] [immigration documents "prepared for administrative purposes" not testimonial]; *State v Staudenmayer*, 411 Mont 167, 176, 523 P3d 29, 35 [2023] [minute entries not testimonial because primary purpose is to "aid the administration of the trial court"]; *Jackson v United States*, 924 A2d 1016, 1020-1021 [DC 2007] [docket entries and notice to return created for operation of the court, not to document facts or events for future prosecution]).

Finally, the pedigree information collected, including the defendant's address, is pertinent to establishing community ties; it is only incidentally relevant in this case (*see e.g. Noria*, 945 F3d at 857-858 ["No doubt, the biographical portion of an (immigration form) can be helpful to the Government in a later criminal prosecution," but it is not testimonial because its "primary purpose is administrative, not investigative or prosecutorial"]; *Caraballo*, 595 F3d at 1229 [an "incidental or secondary use" is of "little moment" because the question is the "*primary* purpose"]). The fact that the report became relevant during this trial does not alter or diminish the primary purpose for which it was created (*see Clark*, 576 US at 250).

The introduction of the CJA interview report thus did not violate the defendant's

right of confrontation, and consequently, we reverse.[8]

Accordingly, the order of the Appellate Division should be reversed, and the case

remitted to that Court for consideration of the facts and issues raised but not determined on

appeal to that Court.

---

[8] Although the dissent suggests that CJA interview reports may be widely used against defendants, we have identified only four cases over the past five decades in which the prosecution has attempted to do so at trial, even though CJA presumably creates these forms for countless individuals arrested by NYPD every year (*see e.g. Jin Cheng Lin*, 26 NY3d at 714-715; *People v Mitchell*, 74 AD3d 417 [1st Dept 2010], *lv denied* 15 NY3d 922 [2010] [holding that a CJA report was a "business record" and "not testimonial"]; *Williams*, 264 AD2d at 328-329; *Brown*, 109 Misc 2d at 367). Policy issues sounding in the right to counsel and the Fifth Amendment right against self-incrimination are not before us in this case and we do not opine on them (*see* brief for amicus curiae University of Buffalo School of Law).

Aarons, J. (dissenting):

The issue is whether an interview report recommending defendant's pretrial release, produced by the New York City Criminal Justice Agency (CJA) at Queens Central Booking while defendant awaited arraignment and provided directly to the arraignment court, was "testimonial" and thus subject to the Confrontation Clause. I would conclude that the CJA report was a "statement[ ] that [was] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (*Crawford v Washington*, 541 US 36, 52 [2004] [internal quotation marks and

- 1 -

citation omitted]). Put another way, "its primary purpose was testimonial" (*Ohio v Clark*, 576 US 237, 245 [2015]).

The majority takes the opposite view, relying on assumptions about the relevant circumstances, i.e., pretrial release determinations are administrative, the residential address collected is merely "pedigree information" rather than viewing the CJA report as a critical datapoint in assessing pretrial release.

And for that effort, the majority concludes that a jailhouse interview report generated at the start of a criminal prosecution and submitted to the court to utilize in a core judicial decision concerning a defendant's liberty is *not* a "testimonial" statement. Because the Sixth Amendment right of confrontation applies to the CJA report at issue here, I respectfully dissent.

**I**

<u>A</u>

The facts of defendant's alleged crime are essentially as the majority articulates. Police found a gun in the basement of a house defendant shared with his stepmother and son but found no direct evidence that defendant had dominion and control over that space – an element deemed essential by all parties to prove defendant constructively possessed a weapon in violation of the law.

After defendant's arrest, he was jailed at Queens Central Booking to await arraignment. There, an employee of the CJA – a nonprofit agency under contract with and funded by the City of New York – interviewed defendant to assess his fitness for pretrial release and bail and make a recommendation to the arraignment court.

Significantly, on the subject report, the CJA employee wrote "BSMT" next to defendant's current address of "117-48 168TH ST." The report also indicates defendant's mother "verified" that defendant lived with her at that address, and that he had lived there for 3 years.

And herein lies the problem – the arresting officer testified only to defendant's street address, whereas the CJA report adds "BSMT."[1] Therefore, it is critical to this case to know who said that he lived in the basement, when, and under what conditions. The interview report captures data about defendant as well has his mother, which undermines the reliability of the form language indicating that the address came from defendant. Regardless, the only "witness" statement the People offered to prove defendant occupied the basement was the CJA employee's report asserting defendant lived at his home address in a "BSMT."

## B

Rather than produce the CJA employee who wrote "BSMT" on the form, the People introduced the report through Oscar Morales, the recently installed Queens borough

---

[1] The majority refers to defendant's address as "pedigree information," which is the term used for basic data such as name, address and birthdate taken down after a defendant is arrested and booked. In this context, however, "the data . . . goes far beyond the mere pedigree information secured by arresting officers during the booking procedures. For example, the police official asks simply for the defendant's residence. The CJA staff member, on the other hand, inquires also as to: the length of such residence; with whom the defendant lives; any alternative residence; and the names of friends and relatives who can confirm such information." (*People v Brown*, 109 Misc 2d 366, 371 [Sup Ct, NY County 1981]). That information factors into the pretrial release recommendation. Indeed, according to the unredacted subject report, defendant received points in his favor for providing a verified "NYC area address."

manager for CJA who did not interview defendant, complete the report, or have any direct knowledge as to whether defendant said he lived in the basement or whether he in fact lived there. Indeed, when the interview was conducted in 2016, Morales was working at the Bronx CJA in an unspecified role for an unspecified period with no indication he knew of CJA's business practices at that time (*cf.* CPLR 4518).

Nevertheless, Morales testified to the procedure used to generate the report at Queens Central Booking – where he had been working for about a year. According to Morales, the CJA interviewer goes to an arrestee's cell, who is called over for the five-minute interview while waiting to be arraigned. At this point, the interviewer uses a tablet to collect some information from the arrestee, including the arrestee's "name, date of birth, sex, address, prior address, whether or not they work, [and] whether or not someone is coming to court during their arraignment." The interviewer records this information on an interview report form, then verifies the information collected with another source identified by the arrestee. All of this is done so that "CJA can verify community ties in order to make our recommendation to the Judge that they can be released without paying bail." The interviewer calculates point values based upon the arrestee's and verifier's responses and records a recommendation for pretrial release on the interview report. The court receives a copy of the report along with the prosecutor and defense counsel.

<u>C</u>

The majority asserts that the CJA report serves the court's administrative function. Not so. The CJA report is created in the context of an arraignment – a decidedly judicial affair (*see Clark v Town of Ticonderoga*, 291 AD2d 597, 600 [3d Dept 2002], *lv denied* 98

NY2d 604 [2002]). Among other functions, an arraignment commences the criminal action, and is the process by which a person charged with a crime is brought under the personal jurisdiction of the court (*see* CPL 1.20 [9]). With jurisdiction established, the court then issues a "securing order" that reasonably assures the defendant will return to court (CPL 500.10 [5]; *see* CPL 510.10 [1]). Depending on the crime alleged and certain other factors, the securing order may incarcerate the defendant to await trial with or without bail or direct release on the defendant's own recognizance with or without conditions (*see* CPL 500.10 [5]; 510.10 [1]). To make that determination, the court at the time of defendant's arraignment in 2016 was required to use "available information" to consider, among many other factors, defendant's "family ties and the length of [their] residence if any in the community," along with defendant's "employment and financial resources" and "previous record[,] if any[,] in responding to court appearances when required or with respect to flight to avoid criminal prosecution" (CPL former 510.30 [2] [a]).

A court may not necessarily have had access to the information required to issue the securing order, but it could rely upon a report from a pretrial services agency to collect the information at the time a defendant is arraigned. Such an agency is either "a public entity under the supervision and control of a county or municipality or a non-profit entity under contract to the county, municipality or the state" (CPL 510.45 [2]). Outside of New York City, pretrial services are generally the purview of the county probation departments (*see People v Yu*, 167 AD3d 521, 522 [1st Dept 2018] *lv denied* 33 NY3d 1037 [2019]). Within New York City, the CJA does that job pursuant to a contract with the City, which funds its

operation (*see id.*). Said differently, the CJA does a job that everywhere else in the state is entrusted to law enforcement officers (*see generally* CPL 2.10 [24]; 2.20).

**II**

The Federal Constitution guarantees criminal defendants the right "to be confronted with the witnesses against [them]" (US Const 6th Amend). "In particular, the Confrontation Clause is concerned with admission of testimonial statements made by declarants who are unavailable for cross-examination" (*People v Hao Lin*, 28 NY3d 701, 704 [2017], citing *Williams v Illinois*, 567 US 50, 76 [2012]). "Thus, under [Supreme Court] precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause' " (*Ohio v Clark*, 576 US at 245, quoting *Michigan v Bryant*, 562 US 344, 359 [2011]).

Tying the confrontation right to a determination that a hearsay statement is "testimonial" originates in *Crawford v Washington* (541 US 36), though that case did not define the universe of statements that could be testimonial. Instead, the *Crawford* Court looked to an 1828 Webster's Dictionary and used the definitions of *witness* and *testimony* to identify a "core class" of testimonial statements. The Court listed "[v]arious formulations of this core class," including, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (*id.* at 51 [internal quotation marks, citation omitted]). The Court also identified "affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, *or similar pretrial statements* that declarants would reasonably

expect to be used prosecutorially" (*id.* [internal quotation marks and citation omitted; emphasis added]). Indeed, "[r]egardless of the precise articulation, some statements qualify under any definition – for example, *ex parte* testimony at a preliminary hearing" (*id.* at 52 [internal quotation marks and citation omitted]).

Of course*, Crawford* was addressed to an out-of-court statement by a witness to police, which was not a scenario animating the Sixth Amendment's ratification in late 18th century (*see id.* at 52-54). Consequently, police interrogations did not fit neatly into the core class of testimonial statements assembled using the tools of originalism. The *Crawford* Court, speaking through Justice Scalia, temporarily solved this problem by analogizing modern police interrogations to questioning by 17th century English magistrates and then simply included those interrogations in the core class.

Because *Crawford* could be read as subjecting all out-of-court statements to police to the Confrontation Clause analysis, the Supreme Court later refined its definition of *testimonial* through the primary purpose test. The Court in *Davis v Washington* (547 US 813 [2006]) emphasized that the correct application of the test must look to all of the surrounding circumstances. Accordingly, the Court concluded that statements made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" were not testimonial – for example, a 911 call reporting an assault that had occurred moments before (*id.* at 818, 822). By contrast, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," such as

statements made to police arriving at the location of a domestic violence incident that had already ended, and therefore the officers' questions about that incident were investigatory (*id.* at 821-822). Nothing in *Davis* overruled *Crawford*; the fact that the Court limited how statements to police triggered the right of confrontation did not negate the other examples of core-class testimonial statements (*see Lambert v Warden Greene SCI*, 861 F3d 459, 469-470 [3d Cir 2017]).

*Ohio v Clark* (576 US 237) further refined the primary purpose test as applied to out-of-court statements made by and to individuals who are not law enforcement. Those statements are by their nature less likely to be testimonial than statements made to police and other government officials (*see Crawford v Washington*, 541 US at 51). In that case, statements by a child to his teachers reporting abuse were not testimonial because the primary purpose of those conversations was protective, not investigatory, and the teachers were not "principally charged with uncovering and prosecuting criminal behavior" (*Ohio v Clark*, 576 US at 249).

The *Clark* Court articulated the primary purpose test as "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony' " (*id.* at 245, quoting *Michigan v Bryant*, 562 US at 358). This is the test the majority clarifies that courts should apply to ascertain whether out-of-court statements are testimonial (*see* majority op at 7).

### III

#### A

"[C]onsidering all the relevant circumstances here," the primary purpose of the CJA interview report was testimonial (*Ohio v Clark* 576 US at 246; *see Michigan v Bryant*, 562 US at 369). The CJA report – generated for and given directly to the court during a criminal prosecution to prove facts and make conclusions about defendant – is a "pretrial statement[ ] that declarants would reasonably expect to be used prosecutorially" (*Crawford v Washington*, 541 US at 52). Although titled an interview report, the verification step makes the process of generating it investigative. The CJA provides services of a probation department, including operating a supervised release program in Queens, which, in my view, makes that organization like a law enforcement agency for present purposes. Assuming the procedure outlined by Morales was followed – an issue defendant does not concede – the CJA employee created the subject report after questioning defendant while he was in custody. Although the interview report form in the record was not a sworn statement, "the absence of oath is not dispositive" of testimoniality (*id.* at 52). That the report was generated for the court itself indicates it was made with sufficient solemnity to qualify as testimonial (*see id.*). In sum, the formality of the circumstances under which the report was created, the role of the CJA employee, the interview and verification procedure, and the intended recipient all lean toward concluding the CJA interview report was testimonial (*see id.* at 51; *cf. Garlick v Lee*, 1 F4th 122, 134-135 [2d Cir 2021], *cert denied* 142 S Ct 1189 [2022]).

Four other considerations merit attention in the analysis. *First*, the report was generated in preparation for arraignment – the start of defendant's criminal prosecution (*compare United States v Noria*, 945 F3d 847, 849-851, 856 [5th Cir 2019], *cert denied* 140 S Ct 2629 [2020]; *United States v Hano*, 922 F3d 1272, 1287 [11th Cir 2019], 140 S Ct 488 [2019]; *United States v Caraballo*, 595 F3d 1214, 1226-1227, 1229 [11th Cir 2010]).

*Second*, the CJA interview report functioned, essentially, as a fact-finding tool for the court to use in meeting its obligation to issue a securing order informed by relevant considerations (*see* CPL former 510.30 [2] [a]; *People v Yu*, 167 AD3d at 522). This direct connection to the court sets the CJA interview report apart from the kinds of statements the primary purpose test was written to address in *Clark* and *Davis*.

*Third*, the statements in the report "can be used against [arrestees] if they violate any release conditions" (*People v Brown*, 109 Misc 2d 366, 369 [Sup Ct, NY County 1981]).

*Fourth*, the report provides data to determine pretrial release, which bears on an arrestee's prosecution. As one trial judge wrote over 40 years ago,

> "Competent studies have fully documented the many disadvantages endured by incarcerated defendants – both pretrial and postconviction – as compared to their bailed or paroled counterparts. Lack of adequate ability to prepare a defense, to consult with counsel, to communicate with relatives and friends, to locate witnesses and to gather evidence, are but a few, pretrial; as well as a greater likelihood of conviction in

all events. Postconviction, the detainee can expect a more severe sentence." (*Id.* at 368 [internal citation omitted].) [2]

B

In light of these considerations, I cannot subscribe to the majority's conclusion that the subject report fails the *Clark* primary purpose test. The report was a testimonial statement because it was generated for the court "to create a record for [defendant's] criminal prosecution" (*United States v LeBeau*, 867 F3d 960, 961 [8th Cir 2017]). But for that prosecution, there would be no conversation between the CJA employee and defendant and thus no report – a relationship that suggests the primary purpose of the conversation and report was "prosecutorial" (*United States v Noria*, 945 F3d at 857).

Simply stated, the declarant at issue – the CJA employee – is speaking through the report to the court.[3] No doubt, defendant and the CJA employee knew this when defendant's interview occurred (*see People v Brown*, 109 Misc 2d at 369). The CJA employee's questions and that employee's duty to ask them – and thus the report generated by that

---

[2] In other words, the CJA interview report informs the court's pretrial release decision, which has a measurable impact on whether a criminal prosecution will result in a conviction. And the CJA is not blind to this connection (*see e.g.* New York City Criminal Justice Agency, *What are the court case outcomes for prosecuted arrests?*, https://www.nycja.org/court-case-outcomes [last accessed Apr. 19, 2024] ["In 2022, there were 87,909 disposed cases stemming from Summary Arrests that were not resolved at arraignment. . . . For those released pretrial, 24% of cases were resolved with a guilty disposition, compared to 62% for those detained until disposition"]). In my view, that connection and the CJA's awareness of it are relevant considerations in determining whether the primary purpose of the CJA interview report "is to establish or prove past events potentially relevant to later criminal prosecution" (*Davis v Washington*, 547 US at 822).

[3] There is no dispute that the CJA employee wrote "BSMT" and everything else in the report.

questioning – were prescribed by the employee's obligation to the court (*compare Ohio v Clark*, 576 US at 249). Defendant's responses to the CJA employee's questions were therefore informed by his awareness of the employee's role as a court functionary (*compare id.*).

Worth noting is that the primary purpose test was developed on facts that differ from this case in important ways. Put plainly, neither the police in *Davis* nor the teachers in *Clark* wrote reports about their conversations with the complainants in those cases that they immediately handed directly to the court for a judicial determination as those prosecutions commenced.[4] Identifying this case's distinguishing features is important because the primary purpose test is a fact-driven inquiry (*see e.g. Ohio v Clark*, 576 US at 246-251; *Michigan v Bryant*, 562 US at 359, 374-375). And the Supreme Court has not provided an exhaustive list of considerations bearing on the primary purpose test (*see Davis v Washington*, 547 US at 822). Relatedly, the Supreme Court has not set categorical rules for determining testimonial statements (*see Ohio v Clark*, 576 US at 246).[5] In light of this history, I do not read *Clark* or other Supreme Court precedent to bar this Court from holding the CJA report testimonial.

---

[4] I do not suggest a defendant should be able to assert the confrontation right during arraignment (*see* majority op at 12 n 7).

[5] Even after *Clark*, courts occasionally seem to pick and choose among Supreme Court decisions setting out Confrontation Clause precedent (*see e.g. United States v Foreman*, 84 F4th 615, 620 [5th Cir 2023] [using test articulated in *Davis v Washington* (547 US 813, 822 [2006])]; *United States v Noria*, 945 F3d at 852 [same], quoting *Bullcoming v New Mexico*, 564 US 647, 659 n 6 [2011] [same]; *see also People v Ortega*, 40 NY3d 463, 474 [2023], quoting *Crawford v Washington*, 541 US at 51; *see generally United States v Miller*, 982 F3d 412, 436-437 [6th Cir 2020], *cert denied* 141 S Ct 1354 [2021]).

In any event, the primary purpose test requires consideration of all relevant circumstances. The report here took the place of the CJA employee speaking directly to the court at the start of defendant's criminal prosecution to inform a judicial decision impacting him. From that perspective, and in view of all of the relevant circumstances – many of which were not at issue in *Clark* and its predecessors – the primary purpose of the CJA interview report was testimonial (*cf. Lambert v Warden Greene SCI*, 861 F3d 459, 469 [3d Cir 2017], quoting *Crawford v Washington*, 541 US at 68).

## IV

The CJA report is not some kind of intake form; it is a statement by a person standing in the shoes of a law enforcement officer working within the criminal justice system about a defendant that has critical consequences for that defendant's liberty. Starting at arraignment, the report can help or hurt a defendant: declining to participate in the CJA interview will count against the defendant and jeopardize his freedom despite being cloaked with the presumption of innocence (*see People v Brown*, 109 Misc 2d at 374). Regardless of its contents, the People receive a copy, and it can be used to make any case they can against a defendant's interests. And it's tucked into the court's file to be pulled out and leveraged against a defendant at any time during the prosecution.

Today, this Court approves of using a CJA interview report to prove where a defendant lived in a prosecution that hinges on that fact. Tomorrow, it may be used to prove any other fact that the report assembles, such as a defendant's employment status, where he gets his money, whom he financially supports, how he pays for his food, his history in treatment programs, or any other information that the CJA gives to the court about a locked-

up defendant.[6] The confrontation right does not bar the report from coming in as evidence at all; it simply requires the proponent of the evidence to produce the witness who wrote it. Nothing more.

The Confrontation Clause is meant to protect against convictions based upon untested and unreliable evidence. In this case, a lone statement of questionable provenance secured defendant's conviction. The People concede that, if the trial court erred, that error would not be harmless, necessitating a new trial. I agree and cast my vote in favor of that outcome.

Order reversed and case remitted to the Appellate Division, Second Department, for consideration of the facts and issues raised but not determined on appeal to that Court. Opinion by Judge Halligan. Chief Judge Wilson and Judges Garcia, Singas and Cannataro concur. Judge Aarons dissents in an opinion, in which Judge Bannister concurs. Judges Rivera and Troutman took no part.

Decided April 25, 2024

---

[6] Although there is a small number of reported cases in which the prosecution sought to introduce the CJA report as evidence (*see e.g. People v Jin Cheng Lin*, 26 NY3d 701, 714-715 [2016]; *People v Mitchell*, 74 AD3d 417 [1st Dept 2010], *lv denied* 15 NY3d 922 [2010]; *People v Williams*, 264 AD2d 325, 328 [1st Dept 1999], *lv denied* 93 NY2d 1046 [1999]; *People v Brown*, 109 Misc 2d at 367), that number will surely increase as a result of this case.